**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| John F. Fleming, | No. CV-14-02333-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| IASIS Healthcare Corporation; St. Luke's Behavioral Hospital, LP; and IASIS Healthcare, LLC, | |
| Defendants. | |

Before the Court is Defendants' Motion for Summary Judgment (Doc. 56) and the parties' accompanying statements of facts and briefs. For the reasons that follow, the Motion will be granted.

**I.    INTRODUCTION**

St. Luke's Behavioral Hospital, LP ("St. Luke's") is a hospital in Phoenix, Arizona. It is owned and operated by IASIS Healthcare Corporation, the sole member of IASIS Healthcare, LLC (collectively "IASIS").

St. Luke's hired John Fleming in 2000 and fired him in 2012. Fleming claims his termination was illegally motivated by one or more of the following considerations: his sex, religion, age, disability, and statutorily protected activity. He also claims that, even

if his termination was lawful, his employment contract entitles him to compensation for unused "paid time off" hours.

St. Luke's and IASIS (collectively "Defendants") move for summary judgment on all these claims. They contend Fleming was fired due to his poor performance and that he is not contractually entitled to any additional compensation.

## II.   LEGAL STANDARD

A motion for summary judgment tests whether the opposing party has sufficient evidence to merit a trial. Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The movant has the burden of showing the absence of genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, once the movant shows an absence of evidence to support the nonmoving party's case, the burden shifts to the party resisting the motion. The party opposing summary judgment must then "set forth specific facts showing that there is a genuine issue for trial" and may not rest upon the pleadings. *Anderson*, 477 U.S. at 256. To carry this burden, the nonmoving party must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party, must not weigh the evidence or assess its credibility, and must draw all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255.

Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

## III. MATERIAL FACTS

The following facts are drawn from the undisputed portions of Defendants' statement of facts (Doc. 57), Fleming's statement of facts (Doc. 61), and parts of the record identified in the parties' briefs. All evidence is viewed in the light most favorable to Fleming.

### A. Evidence Relating to Whether Fleming was Illegally Terminated

Fleming claims he was fired because of his sex, religion, age, and disability, and in retaliation for engaging in statutorily protected activity.[1] Defendants contend Fleming was fired due to poor performance. Evidence relating to these claims is described below.

#### 1. Performance History

In 2000, St. Luke's hired Fleming as a Therapist. (Doc. 57 at ¶ 17.) In 2005, Fleming began working in St. Luke's Intake and Assessment Department. (*Id.* at ¶ 18.) He received annual performance-based raises. (Doc. 61 at ¶ 153.) He was good with patients and good at responding to crises, and patients liked him. (*Id.* at ¶ 200.) But there were problems.

In 2005, a supervisor reprimanded Fleming for (1) failing to follow proper procedures for contacting physicians on call, (2) improperly filling out a doctor rotation

---

[1] In recent briefing, Fleming also mentions a "hostile work environment" and a failure to provide "accommodations." (Doc. 60 at 9-10.) The Court views these passing references as part of Fleming's claim of illegal termination, not as separate claims. Indeed, Fleming clarifies he "does not seek separate recovery based on the hostile environment itself," and he mentions the refusal to provide accommodations as confirmation that "Defendants created a pretext to justify the termination." (*Id.*) Further, even if these were separate claims, they would fail. Fleming has not identified conduct sufficiently severe or pervasive to constitute a hostile work environment. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 798 (9th Cir. 2003). And he did not allege any failure to accommodate in his complaint. (Doc. 1-1.)

sheet, (3) improperly assigning patients to beds, and (4) admitting a patient under the wrong insurance. (Doc. 57 at ¶¶ 21, 24, 26.) According to the annual Performance Evaluation, Fleming was "struggling" with some of the patient intake processes and was "struggling" to complete patient assessments in a timely manner. (*Id.* at ¶ 29.) However, the Evaluation also included positive comments and concluded that Fleming "meets standards" overall. (Doc. 61 at ¶ 28.)

In 2006, a supervisor reprimanded Fleming for improper and untimely submissions of work hours. (Doc. 57 at ¶ 33.) The supervisor also instructed him to expedite the patient admissions process and to learn more about the "pre-certification" process of obtaining an insurance company's approval for treatment. (*Id.* at ¶¶ 35, 37.) According to the annual Performance Evaluation, Fleming needed to "expedite" the patient admissions process, be "more thorough," and show "more consistency." (*Id.* at ¶ 39.) However, the Evaluation also included positive comments and concluded that Fleming "meets standards" overall. (Doc. 61 at ¶ 39.)

In 2007, supervisors reprimanded Fleming for (1) failing to complete patient evaluations, (2) failing to follow the behavioral health certification process, (3) failing to document a call from a patient in crisis, (4) excessive unplanned absences, (5) inappropriate use of evaluation and treatment waivers, and (6) poor clinical judgment. (Doc. 57 at ¶¶ 42, 45, 47, 51, 54.) Fleming did not deny that his actions put a patient at risk. (*Id.* at ¶ 52.) A supervisor warned him that he should consider other employment options if he continues to make poor patient evaluations. (*Id.* at ¶ 56.) According to the annual Performance Evaluation, Fleming needed improvement in "organization," "time," "documentation," and number of "errors." (*Id.* at ¶ 59.) However, the Evaluation also included positive comments and concluded that Fleming "Meets the Standard" in most areas. (Doc. 61 at ¶ 58.)

In 2008, a supervisor reprimanded Fleming for failing to pursue an appropriate treatment plan, thereby putting a potentially suicidal patient at risk. (Doc. 57 at ¶ 61.)

The supervisor warned him that if he puts one more patient at risk, "the possibility of termination will be pursued." (*Id.*)  Weeks later, the supervisor also reprimanded Fleming for (1) failing to complete a mandatory patient evaluation and (2) failing to contact a physician before transferring a patient. (*Id.* at ¶¶ 64, 67.)  The supervisor warned him that any further disciplinary actions "could result in termination." (*Id.* at ¶ 67.)  Later that year, supervisors reprimanded Fleming for (1) disregarding instructions about admitting a patient, (2) excessive non-business Internet use, and (3) reeking of alcohol while at work. (*Id.* at ¶¶ 71, 75, 82.)  According to the annual Performance Evaluation, Fleming needed to "follow the designated process" and "expedite" patient admissions. (*Id.* at ¶ 73.)  However, the Evaluation also included positive comments and concluded that Fleming "meets standards" overall. (Doc. 61 at ¶ 73.)

In 2009, supervisors reprimanded Fleming for (1) failing to complete a patient evaluation, (2) taking a smoke break during a patient's disposition, (3) excessive tardiness, (4) failing to complete the required number of patient assessments per shift, and (5) incorrectly filling out a "duty to warn" form. (Doc. 57 at ¶¶ 83, 86, 89.)  According to the annual Performance Evaluation, Fleming needed improvement in "expediting" the patient assessment process. (*Id.* at ¶ 91.)  However, the Evaluation also included positive comments and concluded that Fleming "Meets the Standard" or "Exceeds the Standard" overall. (Doc. 61 at ¶ 91.)

In 2010, a supervisor reprimanded Fleming for his poor judgment and incomplete work with respect to patient care. (Doc. 57 at ¶ 95.)  The supervisor warned him: "This is the final conference.  Any further disciplinary action will result in termination." (*Id.*)  Weeks later, the supervisor reprimanded Fleming for excessive unapproved absences. (*Id.* at ¶ 98.)  The supervisor warned him that another unexcused absence "will set in motion the final steps in the disciplinary process leading to termination." (*Id.*)  Later that year, the same supervisor reprimanded Fleming for (1) failing to follow up with discharged patients and (2) writing the wrong doctor's name on an admission document.

(*Id.* at ¶¶ 100, 102, 103.)  Then a new supervisor, Julie Miller, filled out Fleming's annual Performance Evaluation.  (*See id.* at ¶ 105.)  Miller noted that Fleming needed to do "more" patient admissions and needed to do patient pre-certifications "quickly."  (*Id.*)  However, she also included positive comments and concluded that Fleming "Meets the Standard" or "Exceeds the Standard" overall.  (Doc. 61 at ¶ 105.)

In 2011, Miller reprimanded Fleming for (1) telling a patient no hospital beds were available instead of offering an assessment, (2) failing to perform pre-certifications and instead leaving them for the next shift, (3) tardiness, (4) failing to follow up with discharged patients, (5) saying that he called Miller for a consultation when in fact he did not, (6) saying that he checked his email for an important message when in fact he did not, and (7) failing to write down information given to a patient.  (Doc. 57 at ¶¶ 107, 109, 111.)  In the annual Performance Evaluation, Miller noted that Fleming needed to "maintain productivity" and "improve consistency."  (*Id.* at ¶ 112.)  However, she also included positive comments and concluded that Fleming "meets standards" overall.  (Doc. 61 at ¶ 112.)

The month leading up to Fleming's termination was eventful.  In a Performance Evaluation dated September 4, 2012, Miller noted that Fleming's "documentation has been lacking information and he has had many incomplete forms" and that "he could work on doing a faster assessment/admit process and be more consistent with his work."  (Doc. 57 at ¶ 116.)  She also included positive comments and concluded that Fleming "meets standards" overall.  (*See* Doc. 61 at ¶ 153.)  On September 10, Miller gave Fleming a final written warning for (1) sending improper documentation to family members of two different patients, (2) seeing a patient for whom he failed to complete an authorization form, and (3) failing to complete a patient assessment.  (Doc. 57 at ¶ 121.)  On September 13, Miller reprimanded Fleming for failing to use a cover sheet when faxing a patient's protected health information, in violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  (*Id.* at ¶ 118.)

The incident immediately preceding Fleming's termination occurred on September 25, 2012. Fleming assigned a 12-year-old patient to an overcapacity bed without completing the necessary procedures. (*Id.* at ¶¶ 130-40.) Fleming left the task of completing the overcapacity procedures for the next shift, telling his co-worker Alisa Furch: "I'm not going to stay a moment longer, you can do it." (*Id.* at ¶ 141.) Fleming could not stay longer because he was experiencing tremendous back pain and had lost feeling in his writing hand. (Doc. 61 at ¶ 138.) Fleming had already stayed at work longer than scheduled, and he thought completing the overcapacity procedures would be complicated and time consuming and would preclude the patient from receiving treatment. (*Id.*) He had the authority to delegate the task to Furch. (*Id.* at ¶ 190.) When Miller heard about this incident, however, she believed Fleming should have completed the overcapacity procedures himself because the patient was Fleming's responsibility. (Doc. 57 at ¶¶ 142-45.)

The Human Resources Director, Amy Howell, recommended that Miller suspend Fleming and investigate the incident. (*Id.* at ¶¶ 120, 148.) Accordingly, Miller suspended Fleming. (*Id.* at ¶ 149.) Fleming had never been suspended before. (Doc. 61 at ¶ 153.) Miller then spoke with Furch and two other employees and reviewed patient documentation to determine whether Fleming had followed proper procedure. (Doc. 57 at ¶ 150.) She did not speak with Fleming during her investigation. (Doc. 61 at ¶ 192.) After the investigation, Miller and Howell concluded Fleming should be terminated. (Doc. 57 at ¶¶ 151-52.) Fleming's prior disciplinary history played a role in their decision, according to later statements. (*Id.* at ¶ 153.) Howell then contacted the IASIS Vice President of Human Resources to explain the situation, discuss Fleming's disciplinary history, and request authorization to terminate. (*Id.* at ¶ 154.) On October 1, Fleming met with Miller, Howell, and another St. Luke's employee named Jennifer Govan. (*Id.* at ¶ 156; Doc. 57-1 at 78.) He was told he was being terminated for failing to follow proper procedure while on a final warning. (Doc. 57 at ¶ 156.)

### 2. Sex Discrimination

Fleming believes many of the complaints that led to his reprimands targeted him because he was male. (Doc. 61 at ¶ 173.) When Fleming requested time off, female employees with less seniority were given time off, but Fleming was not. (*Id.* at ¶ 175.) On one occasion, female employees with less seniority were allowed to attend an employee awards ceremony, but Fleming was not. (*Id.* at ¶ 176.) When Fleming requested a preferred workstation due to his back pain and his role as a lead therapist, his request was denied, and a female employee with less seniority used the workstation instead. (*Id.* at ¶ 197.)

Fleming was also treated differently from two female employees who were involved in the September 25 incident preceding his termination. Furch, like Fleming, did not complete the overcapacity procedures. (*Id.* at ¶ 190.) And Kathy Bouise did not reserve a bed that would have prevented the need for overcapacity procedures in the first place. (*Id.* at ¶ 185.) Neither was disciplined. (*Id.* at ¶ 184.) In addition, other employees in "the unit" who failed to take appropriate action were not disciplined. (*Id.* at ¶¶ 184, 186-87.)[2]

No one ever told Fleming he was fired because of his gender. (Doc. 57 at ¶ 158.) He never heard Miller make any negative comments about his gender. (*Id.* at ¶ 164.) No other evidence relating to sex discrimination is identified in the parties' statements of facts or briefs.

### 3. Religious Discrimination

Fleming is Catholic.[3] Fleming believes many of the complaints that led to his reprimands targeted him because he was more religious than other employees. (Doc. 61

---

[2] Fleming does not identify any individuals within "the unit," nor does he specify their age, sex, religion, or disability status.

[3] Although this fact is not specifically stated in the parties' statements of facts or briefs, Fleming alleges he is Catholic in his complaint (*see* Doc. 1-1 at ¶¶ 14, 32), and Defendants do not dispute this in their answer (*see* Doc. 12 at ¶¶ 14, 32).

- 8 -

at ¶ 173.) Miller once said she would not go to a Catholic church. (Doc. 57-1 at 94-95.) Govan said the Catholic Church was a "sick religion" and talked about priests and defiling young boys. (*Id.* at 96.)

Govan was not involved in the decision to fire Fleming. (Doc. 57 at ¶ 155.) No other evidence relating to religious discrimination is identified in the parties' statements of facts or briefs.

### 4. Age Discrimination

Fleming is sixty years old. (Doc. 57 at ¶ 16.) He believes many of the complaints that led to his reprimands targeted him because he was older than other employees. (Doc. 61 at ¶ 173.)

No one ever told him Fleming he was fired because of his age. (Doc. 57 at ¶ 159.) He never heard Miller make any negative comments about his age. (*Id.* at ¶ 163.) No other evidence relating to age discrimination is identified in the parties' statements of facts or briefs.

### 5. Disability Discrimination

Fleming developed carpal tunnel syndrome and back problems. (Doc. 57-1 at 93.) Miller and another supervisor knew about Fleming's back problems and reliance on pain medication. (Doc. 61 at ¶ 194.) Fleming requested a more convenient workstation due to his back pain. (*Id.* at ¶ 197.) He did not provide Miller with a doctor's note stating his need for the workstation. (Doc. 57-1 at 103.) Miller denied his request. (Doc. 61 at ¶¶ 196-97.) Fleming felt that his supervisors perceived his disabilities as inhibiting his performance, and he was not allowed to perform the same tasks as female employees. (*Id.* at ¶ 201.)

No one ever told Fleming he was fired because of his medical conditions. (Doc. 57 at ¶ 160.) He never heard Miller make any negative comments about his medical

- 9 -

conditions. (*Id.* at ¶ 165.) No other evidence relating to disability discrimination is identified in the parties' statements of facts or briefs.[4]

### 6. Retaliation

Fleming claims he was fired in retaliation for complaining about co-workers' behavior and for requesting leave under the Family and Medical Leave Act ("FMLA"). Evidence relating to these claims is described below.

#### a. Complaint about co-workers' behavior

Approximately three years before he was fired, Fleming complained to Miller that co-workers were making inappropriate comments involving age, sex, and religion. (Doc. 57-1 at 104-05.)

No one ever told Fleming he was fired because he complained about co-workers. (Doc. 57 at ¶ 162.) No other evidence relating to this retaliation claim is identified in the parties' statements of facts or briefs.

#### b. Request for FMLA leave

On September 11, 2012, Fleming told Miller he intended to take FMLA leave to receive surgery on his hand and pain management for his spine. (Doc. 61 at ¶ 198.) Miller directed Fleming to the Human Resources Department, where he received FMLA paperwork. (Doc. 57 at ¶ 127.) He submitted this paperwork and received a letter from Human Resources on September 18 confirming receipt of his request. (Doc. 61 at ¶ 198.) He was then suspended on September 26 and fired on October 1. (Doc. 57 at ¶¶ 130, 149, 156; Doc. 57-1 at 78.)

---

[4] In a declaration submitted after the instant motion, Fleming claims he heard that Miller made "negative comments about [his] disability." (Doc. 61 at ¶ 195.) This claim flatly contradicts Fleming's earlier deposition testimony: "Q: You are not aware that [Miller] made comments to you or anybody else regarding your medical condition and disability? A: Correct." (Doc. 57-1 at 138.) Therefore the Court does not consider this claim. *See Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009).

No one ever told Fleming he was fired because he requested FMLA leave. (Doc. 57 at ¶ 161.) No other evidence relating to this retaliation claim is identified in the parties' statements of facts or briefs.

### B. Evidence Relating to Whether Fleming is Contractually Entitled to Additional Compensation

Fleming also claims that, even if his termination was lawful, his employment contract entitles him to compensation for unused "paid time off" hours. Fleming relies on a clause in the IASIS Employee Handbook. On page 26, the Handbook states:

> Unused PTO [paid time off] accrual may be cashed out at full value . . . at the time of termination or retirement provided the employee has been employed at least ninety (90) days.

(Doc. 61 at ¶ 199.) Fleming received a copy of the Handbook in 2007. (Doc. 57 at ¶ 13.)

Defendants contend a different clause in the Handbook precludes Fleming's claim because he was fired. On page 25, the Handbook states:

> [A]ny employee who . . . is involuntarily terminated for any reason other than a reduction-in-force or layoff due to lack of work . . . will not be paid for any unused PTO [paid time off] upon termination of employment . . . .

(*Id.* at ¶ 12.) Fleming was involuntarily terminated for a reason other than a reduction-in-force or layoff due to lack of work. (*Id.* at ¶ 169.)

## IV. ANALYSIS

Fleming claims his termination constituted unlawful discrimination, retaliation, and breach of contract. Each claim is considered in turn.

### A. Discrimination

Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), prohibits an employer from discriminating against an individual because of the individual's "sex" or "religion," among other factors. 42 U.S.C. § 2000e-2(a)(1). The Age Discrimination in Employment Act of 1967, as amended ("ADEA"), prohibits an employer from

- 11 -

discriminating against an individual because of the individual's "age." 29 U.S.C. § 623(a)(1). The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating against a qualified individual "on the basis of disability." 42 U.S.C. § 12112(a). Fleming claims his termination violated all three statutory prohibitions. He offers no direct evidence of discriminatory intent; rather, he relies on circumstantial evidence.

Fleming's discrimination claims all proceed under the *McDonnell Douglas* three-step burden-shifting framework: (1) Fleming must first establish a prima facie case of discrimination; (2) if he does, Defendants must then articulate a legitimate nondiscriminatory reason for its conduct; and (3) if they do, Fleming must then demonstrate that the articulated reason is a pretext for discrimination. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 888-89 (9th Cir. 1994) (applying framework to Title VII and ADEA claims); *see also Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001) (applying framework to ADA claim).

### 1. Prima facie case

To state a prima facie case of Title VII discrimination, Fleming must show that (1) he belongs to a protected class, (2) he was performing his job satisfactorily, (3) he suffered an adverse employment action, and (4) he was treated less favorably than other employees with similar qualifications. *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 640 n.5 (9th Cir. 2003). Similarly, to state a prima facie case of ADEA discrimination, Fleming must show that (1) he belongs to a protected class, (2) he was performing his job satisfactorily, (3) he suffered an adverse employment action, and (4) he was replaced by substantially younger employees with similar qualifications. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). Finally, to state a prima facie case of ADA discrimination, Fleming must show that (1) he is a disabled person within the meaning of the ADA, (2) he was able to perform the essential functions of the job, with or without reasonable accommodation, and (3) he suffered an adverse employment action because of

his disability. *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003). In each case the requisite degree of proof is "minimal," and Fleming "need only offer evidence which gives rise to an inference of unlawful discrimination." *Wallis*, 26 F.3d at 889 (in context of Title VII and ADEA claims); *see also Kinney v. Emmis Operation Co.*, 291 F. App'x 789, 790 (9th Cir. 2007) (applying same standard to ADA claim).

It is doubtful whether Fleming has established a prima facie case of any discrimination. His termination occurred shortly after he violated company policy multiple times while on final warning. *See Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1208 (9th Cir. 2008) (affirming lack of ADEA prima facie case where employee "over an extended period openly violated [company policy] and continued to do so even after receiving a warning"). And his disciplinary history appears to be unparalleled among his co-workers. *See Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (affirming lack of Title VII prima facie case where plaintiff was the only employee subject to a "Last Chance Agreement" and had unmatched "record of misconduct").

Nevertheless, given the low threshold required at this first step of the *McDonnell Douglas* framework, the Court assumes without deciding that Fleming has established a prima facie case. *See Coleman*, 232 F.3d at 1282 (taking this approach).

### 2. Legitimate nondiscriminatory reason

The burden now shifts to Defendants to articulate a legitimate nondiscriminatory reason for firing Fleming. Defendants have articulated two such reasons: (1) Fleming violated company policy on September 25, 2012, after receiving a final warning, and (2) Fleming had also violated company policy many times before then. Defendants have met their burden of production.

### 3. Pretext

The burden now shifts back to Fleming to demonstrate that these articulated reasons are merely a pretext for discrimination. The evidentiary threshold is higher at this step than at the prima facie case, as Fleming must produce "specific, substantial

- 13 -

evidence" of pretext. *Wallis*, 26 F.3d at 890 (in context of Title VII and ADEA claims); *see also Snead*, 237 F.3d at 1094 (finding evidence insufficient to show pretext even though it was sufficient for ADA prima facie case). In an attempt to refute Defendants' articulated reasons for firing him, Fleming offers evidence of two types.

First, Fleming offers evidence that his job performance was satisfactory overall. He relies on the annual Performance Evaluations, which generally placed him in the "meets expectations" category. But this categorization, in light of the dozens of reprimands Fleming earned over the years, seems little more than a conclusion that the evaluator was not ready to recommend termination yet. Fleming attempts to characterize his reprimands as evidence of discrimination, but that characterization is untenable because he does not dispute most of the underlying facts leading up to the reprimands.

And even if the "meets expectations" label is meaningful, it is not evidence of satisfactory performance in the most relevant timeframe. The last Evaluation was made on September 4, 2012. That Evaluation could not have anticipated that on September 10 Fleming would receive a final written warning for improper and incomplete documentation, that on September 13 he would fax confidential patient information in violation of HIPAA, or that on September 25 he would fail to complete a mandatory procedural task and would leave it for the next shift. These incidents alone constitute a legitimate nondiscriminatory reason for termination which is not impugned by Fleming's performance-related evidence.

Second, Fleming offers evidence downplaying the significance of his violations of company policy. In his affidavit, he declares that his actions on September 25 were justified under the circumstances, that other employees were also partially responsible for the September 25 incident, and that his prior infractions were too minor, infrequent, and remote in time to call for termination. But this evidence misses the mark. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Green v. Maricopa Cty. Cmty. Coll. Sch. Dist.*, 265

- 14 -

F. Supp. 2d 1110, 1128 (D. Ariz. 2003) (citation omitted). Fleming's evidence goes primarily to the wisdom of Defendants' termination decision, not its sincerity. This evidence does not indicate dishonesty, and it is dwarfed by the well-documented and largely undisputed evidence of Fleming's lengthy disciplinary history.

In sum, Fleming has not produced specific, substantial evidence of pretext. The record, taken as a whole, could not lead a rational trier of fact to find for Fleming with respect to his discrimination claims.

### B.     Retaliation

Fleming also claims he was terminated in retaliation for complaining about co-workers' inappropriate behavior and for requesting FMLA leave.

#### 1.     Complaint about co-workers' behavior

Title VII, the ADEA, and the ADA all prohibit an employer from retaliating against an employee for engaging in protected activity. *See* 42 U.S.C. § 2000e-3(a) (Title VII); 29 U.S.C. § 623(d) (ADEA); 42 U.S.C. § 12203(a) (ADA). Fleming claims he was fired in retaliation for engaging in the protected activity of complaining about co-workers' inappropriate comments involving age, sex, and religion.

These retaliation claims proceed under the familiar *McDonnell Douglas* burden-shifting framework: (1) Fleming must first establish a prima facie case; (2) Defendants must then articulate a legitimate nondiscriminatory reason for its conduct; and (3) Fleming must then demonstrate pretext. *Pardi v. Kaiser Found. Hosp.*, 389 F.3d 840, 849 (9th Cir. 2004) (ADA retaliation claim); *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (Title VII retaliation claim); *see also Merrick v. Farmers Ins.*, 892 F.2d 1434, 1441 (9th Cir. 1990) (applying Title VII discrimination case law to ADEA retaliation case). To establish a prima facie case, Fleming must show that (1) he engaged in a protected activity, (2) he suffered an adverse employment decision, and (3) there was a causal link between the two. *Pardi*, 389 F.3d at 849; *Hashimoto*, 118 F.3d at 679; *see*

*also O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 763 (9th Cir. 1996) (ADEA retaliation claim).

Fleming has not shown a causal link between his complaint about co-workers and his termination. Fleming's only evidence of causation is that his termination occurred after his complaint. The problem is the three years in between. While temporal proximity between protected activity and adverse employment action may suggest a causal link in some cases, adverse action taken three years afterward "suggests, by itself, no causality at all." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001).

### 2. Request for FMLA leave

The FMLA gives employees the right to take leave for certain reasons. 29 U.S.C. § 2612(a). The FMLA also prohibits employers from interfering with the exercise or attempted exercise of this right. 29 U.S.C. § 2615(a)(1). As a result, "employers cannot use the taking of FMLA leave as a negative factor in employment actions." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122 (9th Cir. 2001) (alteration and emphasis omitted) (quoting 29 C.F.R. § 825.220(c)). Fleming claims Defendants used his request for FMLA leave as a negative factor in deciding to fire him.

This claim does not proceed under the *McDonnell Douglas* burden-shifting framework. *Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir. 2003). Instead, the claim will survive summary judgment if there is a triable issue of material fact as to whether Fleming's FMLA leave request was impermissibly considered as a factor in his termination. *Id.* Here, there is no such triable issue.

Fleming's theory is that, because he was fired two weeks after requesting leave, the "timing of the request and the termination alone create an issue of triable fact here." (Doc. 60 at 13.) In support of this theory, he selectively cites portions of opinions by the First, Sixth, and Ninth Circuits. None of these opinions actually supports his theory, and in fact the first two contradict it.

Fleming quotes a First Circuit opinion for the proposition that "close temporal proximity between two events may give rise to an inference of causal connection." (Doc. 60 at 13 (quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998)).) He refers to this quoted statement as a "holding." (*Id.*) Far from it. The *Hodgens* court affirmed summary judgment *against* the plaintiff employee. 144 F.3d at 173. And the facts there were, if anything, more plaintiff-friendly. Not only had the employee been fired "shortly after" taking FMLA leave, but he also had a "good work history" for three of the five preceding years and his supervisor had recently complained about his "excessive absences." *Id.* at 170. By contrast, Fleming had a checkered work history for all seven years preceding his termination, and his supervisor *helped* him request FMLA leave by directing him to Human Resources for the appropriate paperwork. If summary judgment was justified in *Hodgens*, it is justified here.

Fleming also relies on a Sixth Circuit opinion for the proposition that "close temporal proximity between FMLA leave and termination may be sufficient to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge." (Doc. 60 at 13 (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012)).) It is true that the *Seeger* court held temporal proximity sufficient for a prima facie case of retaliation. 681 F.3d at 284. But that holding is irrelevant. The prima facie case is part of the *McDonnell Douglas* framework, which the Ninth Circuit does not apply to FMLA retaliation claims. *Liu*, 347 F.3d at 1136. And even under this framework, Fleming would flunk the third step of demonstrating pretext. As the *Seeger* court recognized, Sixth Circuit precedent is clear that "temporal proximity cannot be the sole basis for finding pretext." 681 F.3d at 285 (quoting *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012)). The *Seeger* court, like the *Hodgens* court, affirmed summary judgment *against* the plaintiff employee, despite his prima facie case. *Id.* at 287.

Finally, Fleming relies most heavily on a Ninth Circuit opinion, which he quotes for the proposition that the temporal proximity between his leave request and termination

"provides supporting evidence of a connection between the two events." (Doc. 60 at 13 (quoting *Liu*, 347 F.3d at 1137).) The key word there is "supporting." Although the *Liu* court reversed summary judgment against a plaintiff who had been terminated after taking leave, 347 F.3d at 1137, the timing of the termination played only a "supporting" role in the court's opinion. The court first noted that the decision to fire the plaintiff was based largely on her supervisor's "subjective evaluation," which gave the plaintiff low scores in "vague" categories such as "being upbeat." *Id.* at 1136-37. The court also noted a suspiciously steep drop in overall score from the plaintiff's former evaluation. *Id.* In addition, the court found that the supervisor's behavior toward the plaintiff—namely, his "repeated denials of her leave and comments about his increased work-load"— suggested a negative attitude toward her taking leave. *Id.* Only after discussing all this evidence did the court state "the proximity in time between the leave and her termination also provides supporting evidence of a connection between the two events." *Id.* Therefore, the only thing *Liu* established about the timing of termination is that it can *support* a retaliation claim for which there is already other evidence. It did not hold that timing alone creates a triable issue of fact. Indeed, such a rule would place employers in a dilemma as to any unsatisfactory employee who requests leave: either keep him or face trial. The FMLA does not impose this Hobson's choice.

Having rejected Fleming's "timing is enough" theory, the Court returns to the broader question: is there a triable issue as to whether Defendants considered Fleming's leave request in deciding to fire him? The answer is no. The record is replete with instances of Fleming's violations of company policy. As a result of these violations, Miller placed Fleming on final warning. When Miller learned Fleming wanted to request leave, she responded positively by helping him make the request. Only after Fleming violated policy multiple times while on final warning was he fired.

Fleming protests that his prior violations did not result in termination, and that therefore his recent violations could not have been the reason he was fired. This

argument is roughly as convincing as a batter's comparison of his third strike to the first two. Defendants "must be permitted to draw the line somewhere." *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003). Here, Defendants endured dozens of infractions before finally drawing the line. An employer's past leniency, in the form of warnings and second chances, does not oblige the employer to suffer further transgressions. The record, taken as a whole, could not lead a rational trier of fact to find for Fleming with respect to his retaliation claims.

### C.   Breach of Contract

Fleming also claims that, even if his termination was lawful, his employment contract entitles him to compensation for unused "paid time off" hours. He relies on the following clause in his Employee Handbook:

> Unused PTO [paid time off] accrual may be cashed out at full value . . . at the time of termination or retirement provided the employee has been employed at least ninety (90) days.

Defendants contend Fleming is not entitled to this additional compensation, because he was fired. They point to a different clause in the same Handbook:

> [A]ny employee who . . . is involuntarily terminated for any reason other than a reduction-in-force or layoff due to lack of work . . . will not be paid for any unused PTO [paid time off] upon termination of employment . . . .

Fleming argues these clauses conflict and therefore create an ambiguity that should be resolved in his favor. Defendants argue there is no ambiguity: the former clause states a general rule that employees will be compensated for unused "paid time off" hours, and the latter clause identifies an exception for fired employees.

"Whether contract language is ambiguous is a question of law." *Carpenters Pension Trust Fund for N. Cal. v. Underground Const. Co.*, 31 F.3d 776, 778 (9th Cir. 1994). Under Arizona law, a contract is ambiguous "only if the language can reasonably be construed in more than one sense and the construction cannot be determined within the four corners of the instrument." *J.D. Land Co. v. Killian*, 158 Ariz. 210, 212, 762 P.2d

124, 126 (Ct. App. 1988). Here, the disparity between these two clauses does not create an ambiguity. "Where there is an inconsistency between two provisions in a contract, [courts] construe the more specific provision to qualify the more general provision." *Norman v. Recreation Ctrs. of Sun City, Inc.*, 156 Ariz. 425, 428, 752 P.2d 515, 517 (Ct. App. 1988). The competing clauses in the Handbook can be harmonized as follows: Employees generally are compensated for unused "paid time off" hours, but not if they are fired. There is no ambiguity. Because Fleming was fired, he is not entitled to additional compensation.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment (Doc. 56) is granted in full.

IT IS FURTHER ORDERED that the Clerk shall enter judgment in favor of Defendants and against Plaintiff. The Clerk shall terminate this case.

Dated this 21st day of December, 2015.

Neil V. Wake
United States District Judge